No. 22-30171
[NO. 2:21-cr-0129-JCC-1, USDC, W.D. Washington]

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JEFFREY STEPHENS,

Defendant-Appellant.

## GOVERNMENT'S RESPONSE TO FRAP 9(a) APPEAL

Appeal from the United States District Court
for the Western District of Washington at Seattle
The Honorable John C. Coughenour
United States District Judge

NICHOLAS W. BROWN
United States Attorney
Western District of Washington

JOSEPH C. SILVIO
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Telephone: 206-553-7970

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................iv

SUMMARY OF ARGUMENT ......................................................... 1

STATEMENT OF JURISDICTION...................................................3

RELEVANT FACTS AND PROCEDURAL HISTORY............................4

I.     The investigation...................................................................4

       A.     Stephens launders $1 million in drug proceeds ................... 4

       B.     Stephens endorses violence against Jews and the
              government................................................................6

       C.     Stephens discusses his prior acts of drug-
              trafficking and his attempts to expand the scope
              of his operations ........................................................7

       D.     Stephens is indicted .................................................... 9

       E.     Agents arrest Stephens and seize guns and body
              armor ...................................................................... 10

II.    The magistrate judge's September 2021 detention
       order .................................................................................. 11

III.   After the detention hearing, Agents seize more guns,
       drug-trafficking evidence, and fake IDs from
       Stephens's car .................................................................... 12

IV.    A second magistrate judge denies Stephens's motion to
       reopen the detention hearing............................................... 13

V.     Stephens moves the district court to overturn the
       magistrate judges' orders..................................................... 14

VI.   The district court's October 2022 order now on appeal .................14

ARGUMENT ........................................................................................17

I.   The district court correctly ordered Stephens detained
     pending trial ................................................................................17

     A.   Standard of review ...............................................................17

     B.   Applicable law .....................................................................18

     C.   In finding that Stephens is both a flight risk and
          a danger to the community, the district court did
          not clearly err ......................................................................20

          1.   The nature and circumstances of Stephens's
               offenses favor detention. ...............................................22

          2.   The weight of the evidence favors detention ...............24

          3.   Stephens's history and characteristics favor
               detention.........................................................................25

          4.   Release would pose serious dangers ............................27

     D.   No release conditions can adequately protect the
          community and guarantee Stephens's appearance .............27

     E.   Stephens's general challenge to the adequacy of
          the district court's order is without merit...........................28

II.  The district court did not abuse its discretion by
     declining to reopen the detention hearing ...................................29

     A.   Standard of review ...............................................................29

     B.   Applicable law .....................................................................31

     C.   The district court acted well within its discretion...............31

CONCLUSION ....................................................................................36

CERTIFICATE OF RELATED CASES

ii

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## *Supreme Court Cases*

*Smith v. United States,*
    508 U.S. 223, 240 (1993) ........................................................................23

## *Circuit Court Cases*

*United States v. Bothra,* No. 20-1364,
    2020 WL 2611545 (6th Cir. May 21, 2020) ..........................................30

*United States v. Daychild,*
    357 F.3d 1082 (9th Cir. 2004) ..............................................................23

*United States v. Fidler,*
    419 F.3d 1026 (9th Cir. 2005) ..............................................................17

*United States v. Gebro,*
    948 F.2d 1118 (9th Cir. 1991) ..............................................................24

*United States v. Gotti,*
    794 F.2d 773 (2d Cir. 1986) ................................................................30

*United States v. Hare,*
    873 F.2d 796 (5th Cir. 1989) ...............................................................30

*United States v. Hinkson,*
    585 F.3d 1247 (9th Cir. 2009) (en banc) ......................................30, 32

*United States v. Hir,*
    517 F.3d 1081 (9th Cir. 2008) ..................................................... passim

*United States v. Koenig,*
    912 F.2d 1190 (9th Cir. 1990) ..............................................................29

*United States v. Mercado-Moreno,*
    869 F.3d 942 (9th Cir. 2017) ............................................................... 18

*United States v. Motamedi,*
    767 F.2d 1403 (9th Cir. 1985) ...................................................... passim

*United States v. Nwokoro,*
    651 F.3d 108 (D.C. Cir. 2011) ............................................................ 28

*United States v. Peralta,*
    849 F.2d 625 (D.C. Cir. 1988) ............................................................ 30

*United States v. Perez-Silvan,*
    861 F.3d 935 (9th Cir. 2017) ............................................................... 30

*United States v. Reyes,*
    772 F.3d 1152 (9th Cir. 2014) ............................................................ 18

*United States v. Stanford,*
    367 F. App'x 507 (5th Cir. 2010) ........................................................ 30

*United States v. Stephens,*
    237 F.3d 1031 (9th Cir. 2001) ............................................................ 23

*United States v. Stone,*
    608 F.3d 939 (6th Cir. 2010) ............................................................... 22

*United States v. Strong,*
    489 F.3d 1055 (9th Cir. 2007) ............................................................ 30

*United States v. Willoughby,*
    No. 20-30238, Dkt. 8 (9th Cir. Dec. 11, 2020) ............................... 3, 29

*United States v. Winsor,*
    785 F.2d 755 (9th Cir. 1986) ................................................................. 4

### *District Court Cases*

*United States v. Knight,*
    452 F. Supp. 3d 938 (D. Nev. 2020)......................................................31

*United States v. Tommie*, No. CR10-1578
    2011 WL 2457521 (D. Ariz. June 20, 2011) ....................................32-33

*United States v. Ward,*
    63 F. Supp. 2d 1203 (C.D. Cal. 1999) ...................................................31

### *Federal Statutes*

Title 18, United States Code
    Section 3142(e) ................................................................... passim
    Section 3142(e)(3)(A)......................................................................19
    Section 3142(f)..................................................................... passim
    Section 3142(f)(1)(C) ......................................................................18
    Section 3142(f)(2) ...........................................................................30
    Section 3142(g) ................................................................... passim
    Section 3142(g)(2)...........................................................................24
    Section 3142(i)................................................................................29
    Section 3145(b) ................................................................3, 14, 29
    Section 3145(c) .................................................................................3
    Section 3231 .....................................................................................3

Title 21, United States Code
    Section 841(a)(1).............................................................................18
    Section 841(b)(1)(C).........................................................................18
    Section 841(g)(2)(A)(ii) ...................................................................22
    Section 846 ......................................................................................18

Title 28, United States Code
    Section 1291 ......................................................................................3

### *United States Sentencing Guidelines*
    Section 2D1.1(b)(1) .........................................................................24

## SUMMARY OF ARGUMENT

Jeffrey Stephens trafficked drugs on the darknet, worked with drug suppliers overseas, laundered more than $1 million in drug proceeds, and possessed a stockpile of guns and body armor. He also possessed fake driver licenses and used a fake name. He discussed moving overseas. And in recorded conversations with an undercover agent, Stephens—a white supremacist—endorsed violence against Jews and the government.

So it came as no surprise that a magistrate judge ordered Stephens detained pending trial on drug and money-laundering charges. A second magistrate judge later denied Stephens's motion to reopen the detention hearing. And a district judge, reviewing de novo, affirmed the magistrate judges' decisions and found that Stephens should remain detained because he poses both a risk of flight and a danger to the community.

As all three judges below recognized, the record fully supports Stephens's pretrial detention. First, Stephens has never overcome the presumption of detention that applies here. Second, even if he could meet his burden of production and rebut the presumption, the 18 U.S.C. § 3142(g) factors heavily favor detention. The district court did not clearly err in finding that Stephens is both a danger and a flight risk, and that

no bail conditions can adequately mitigate the threats his release would pose. All such conditions suffer from the same fatal defect: they depend on Stephens's good-faith compliance. But given his yearslong history of drug-trafficking, use of sophisticated means to evade law enforcement detection, statements endorsing violence, and possession of a stockpile of guns and body armor, he cannot be trusted to comply with any release conditions. As the judges below recognized, no release conditions can reasonably ensure Stephens's presence or the community's safety.

The district court also acted well within its discretion when it determined that Stephens failed to meet the conjunctive requirements for reopening the detention hearing. In his motion to reopen, Stephens cited no new information unknown to him at the time of the detention hearing that materially bears on the flight risk or dangerousness analysis. *See* 18 U.S.C. § 3142(f). Stephens merely rehashed arguments for release that two judges had already rejected.

Because the district court neither clearly erred nor abused its discretion, this Court should deny Stephens's FRAP 9(a) motion.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the criminal case under 18 U.S.C. § 3231 and was authorized under 18 U.S.C. § 3145(b) to review both the first magistrate judge's initial detention order and a second magistrate judge's order denying Stephens's motion to reopen the detention hearing. This Court has jurisdiction under 18 U.S.C. § 3145(c) and 28 U.S.C. § 1291 to review the district court's order denying the motion to review and revoke both orders.[1]

The magistrate judge entered the detention order in September 2021. APP-184–86.[2] Nearly a year later, Stephens moved to reopen the detention hearing under 18 U.S.C. § 3142(f). APP-75–114. In September 2022, a second magistrate judge denied the motion to reopen. APP-45-49. Later that month, Stephens moved the district court to revoke the first magistrate judge's detention order or reopen the detention hearing. APP-

---

[1] Section 3145(c) authorizes the courts of appeals to review decisions "denying revocation or amendment." That language is not an obvious fit for Stephens's request to review the district court's order denying the reopening of detention proceedings. But a panel of this Court has cited section 3145(c) as the source of its authority to review a decision denying a motion to reopen. *See United States* v. *Willoughby*, No. 20-30238, Dkt. 8 (9th Cir. Dec. 11, 2020).

[2] "APP" refers to the appendix attached to Stephens's FRAP 9(a) memorandum ("Mem."); "CR" refers to district court docket entries.

32–44. In an October 5, 2022 order, the district court denied Stephens's motion to revoke the detention order or reopen the detention hearing. APP-2–6. Six days later, Stephens timely noticed his appeal. APP-1.

## RELEVANT FACTS AND PROCEDURAL HISTORY

### I. The investigation[3]

#### A. *Stephens launders $1 million in drug proceeds*

In December 2018, Stephens responded to advertisements on darknet marketplaces[4] posted by agents of IRS Criminal Investigations. In those ads, IRS-CI agents posed as money launderers offering to "legitimize" illegal proceeds by anonymously converting cryptocurrency into U.S. dollars.

---

[3] These factual statements are based on documentary evidence and written and oral proffers to the district court and on the court's findings. The government "may proceed in a detention hearing by proffer or hearsay." *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986).

[4] The "dark web" or darknet is a portion of the "Deep Web" of the internet, where individuals must use anonymizing software or applications to access content and websites. Criminal marketplaces operate within the dark web, allowing individuals to buy and sell illegal items like drugs, firearms, and other hazardous materials with greater anonymity than is possible on the traditional Internet (sometimes called the "clear web" or simply the "web"). These dark web market websites use various technologies, including the Tor network and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring.

Between December 2018 and August 2021, Stephens conducted more than eighty money-laundering transactions with undercover IRS-CI agents. In most transactions, Stephens sent his cryptocurrency (Bitcoin, Monero, and Ether) to undercover agents. IRS-CI then delivered an equivalent amount of cash to Stephens by mailing it—at Stephens's direction—to Certified Mail Receiving Agencies (CMRAs)[5] throughout Western Washington, or by providing it to Stephens directly at face-to-face meetings with the undercover agent (UC1), who posed as the money launderer conducting these transactions.

For some of these money-laundering transactions, Stephens directed UC1 to mail the cash to CMRA mailboxes rented to "James Zigler." Records from the CMRAs show that Stephens rented those mailboxes using a fake California driver license and a fake New York driver license in the name of "James Zigler," with different birthdates (neither of which is Stephens's actual birthdate).

At in-person meetings, Stephens told UC1 that the cryptocurrency involved in these transactions constituted proceeds of Stephens's sale of

---

[5] A CMRA is a private business that accepts mail from the Postal Service on behalf of its customer.

controlled substances through several vendor accounts on darknet marketplaces over roughly three years. All told, in transactions with UC1 alone, Stephens laundered more than $1 million in drug proceeds.

**B.** ***Stephens endorses violence against Jews and the government***

In September 2020, Stephens began to have in-person meetings with undercover agents. During those meetings, Stephens repeatedly voiced violent extremist views and endorsed violence against Jews, law enforcement, and the government. While Stephens claims that the government takes these statements out of context, that argument failed to persuade the judges below. And Stephens cannot dispute that he made statements to undercover agents such as the following:[6]

- "What we gotta do is entrap them into the next Waco. Them being the federal government. But this time, win."

- "I'm ready to kill regardless. . . I just want everyone to know that . . . . I'm doing it a smart way, don't worry about it . . . . It will be a while. Don't worry. Everything's fine. Listen, I am only going to do it if I am going to win."

---

[6] The textual differences between the statements as transcribed in the government's detention memorandum versus the defense's revised transcription are minimal. *See* APP-168-178.

- "Forget fist fight. I'm going to get my gat [slang for firearm]. [*Laughter*.] Let me get my cop killer 5-7. I want an MP7, bro.[7] The body—MP7 will go through body armor. Fuck you, faggot cops. That's what I want. [*Imitated shooting sound*.]"

- "Are you talking about Oklahoma City? Because we need to do it again. No. McVeigh was a pussy. He's nothing. I'm just joking, but not really. Oh yeah. I can hide it fairly well."

- "Yeah. These fuckin' kike bastards are all going to die. Gas the kikes! Race war now! Heil Hitler . . . . I'm really sorry."

- "I want to move to Estonia . . . . I'm not going to have family here . . . . That's insane . . . . If I have the option to not, why would I do that . . . . Yeah. Sending your kids to a public school here . . . . Can you imagine . . . . That's so irresponsible. Like, uh, so I would go to Estonia or somewhere like that."

APP-19–20, 28, 65–67, 168–78.

## C. *Stephens discusses his prior acts of drug-trafficking and his attempts to expand the scope of his operations*

During a March 2021 meeting with UC1, Stephens said he was struggling to import drugs from his overseas supplier due in part to COVID-related issues and asked if UC1 could help him resolve these issues. Stephens commented that he had tens of thousands of MDMA

---

[7] The MP7 is a German submachine gun. *See* Heckler & Koch, *MP7*, https://www.heckler-koch.com/en/products/military/submachine-guns/mp7a1/mp7a1/overview.html.

7

pills[8] overseas, awaiting shipment to the United States. Stephens also asked UC1 if he had a source of supply for cocaine who charged less than $30,000 per kilogram.

During meetings with UC1 in May and June 2021, Stephens stated that he had ordered hundreds of kilograms from overseas, estimating that he purchased more than 250 kilograms of MDMA and ketamine[9] from his foreign source of supply. Stephens estimated that he had probably sent this overseas source "a million dollars directly" as payment for these drugs.

Stephens further told UC1 that, before he had connections to suppliers who could provide him with bulk quantities of controlled substances, he mainly distributed drugs locally. According to Stephens, he operated an "Uber"-style delivery service, dispatching four to five drivers to deliver drugs throughout the greater Seattle area. Stephens bragged that he had only been in the "business" (drug-trafficking) for five

---

[8] *See* DEA, *Drug Fact Sheet: Ecstasy/MDMA,* https://www.dea.gov/sites/default/files/2020-06/Ecstasy-MDMA-2020_0.pdf.

[9] *See* DEA, *Drug Fact Sheet: Ketamine,* https://www.dea.gov/sites/default/files/2020-06/Ketamine-2020.pdf.

or six years, which was "not that long" considering "how far" he had gotten.

During meetings in mid-July 2021, Stephens discussed plans to expand his drug-trafficking operations. At Stephens's request, UC1 introduced Stephens to a different undercover, who posed as someone who could help Stephens secure a source of supply for cocaine. During meetings with both undercover agents, Stephens explained that he anticipated distributing multiple kilograms of cocaine per month.

UC1 also introduced Stephens to two more undercover agents who posed as individuals who could help Stephens import drugs—sourced from Stephens's overseas supplier—into the United States. Ultimately, Stephens agreed to use that purported new means of importation to smuggle 2.5 kilograms of ketamine into the United States.

### D.  *Stephens is indicted*

A grand jury in August 2021 issued an indictment charging Stephens with one count of conspiracy to distribute controlled substances, including MDMA and ketamine, and six counts of money laundering. CR-1. A superseding indictment in September 2021 added a

codefendant named Alexander Conry to the conspiracy count and added a seventh money-laundering count against Stephens. APP-179–83.

### E. *Agents arrest Stephens and seize guns and body armor*

An undercover Postal Inspector in September 2021 contacted Stephens by text message and gave him instructions for picking up 2.5 kilograms of ketamine that Stephens believed had been imported into the United States from the United Kingdom.

Stephens arrived at the meet location to pick up the "test pack"[10] of ketamine. Stephens was arrested after accepting the test pack. During a search of the truck that Stephens arrived in, investigators seized multiple digital devices, about $5,000 in cash, and the test pack.

Investigators soon executed a search warrant at Stephens's home



in Concrete, Washington. There, investigators found a loaded 12-gauge Remington shotgun, a 12-gauge Benelli tactical semi-

---

[10] This was the initial package of ketamine to be smuggled using the undercover's new means of importation. Ostensibly, this initial shipment was a "test" of the new smuggling method—with larger amounts of controlled substances to follow once validated.

automatic shotgun, and an AR-15 style assault rifle, along with thousands of rounds of ammunition, 18 high-capacity magazines, and body armor. The search also turned up evidence of drug-trafficking, including a digital scale with white powder residue, baggies of suspected cocaine, several suspected Xanax bars, marijuana packaged for distribution, and suspected LSD.

During later forensic searches of Stephens's digital devices, investigators found image files linking Stephens's devices to several of his darknet vendor accounts. Investigators also found encrypted text strings in which Stephens made the "Heil" sign and white-supremacist statements. *E.g.*, APP-26–27.

## II. The magistrate judge's September 2021 detention order

Stephens made his initial appearance on the day of his arrest. The government moved for pretrial detention, arguing that Stephens posed a danger to the community and a risk of flight. CR-10; APP-187–210. After a hearing, U.S. Magistrate Judge Mary Alice Theiler ordered Stephens detained pending trial, finding that he poses both a risk of flight and a danger to the community. APP-184–86.

In that detention order, the magistrate judge highlighted several factors supporting detention, including:

- the seriousness of the charged crimes;

- Stephens's alleged laundering of more than $1 million in drug proceeds;

- Stephens's sending significant sums of currency overseas to drug suppliers;

- Stephens's minimal history of legitimate employment;

- Stephens's statements in which he discussed his intention to kill law enforcement officers and his plans to move abroad; and

- the multiple firearms, high-capacity magazines, and body armor that agents had seized from Stephens's home.

APP-185.

### III. After the detention hearing, Agents seize more guns, drug-trafficking evidence, and fake IDs from Stephens's car

In late September 2021, Stephens's counsel told the government where to find Stephens's car, which the government had failed to locate at the time of arrest. Defense counsel suggested that the car contained

 

two firearms. Two weeks later, agents found the car parked on a public street in Seattle. A warranted search of the car turned up two 9mm pistols, six magazines, suspected controlled substances, a GPS signal jammer, multiple fake insurance cards, and multiple fake identification cards from California, New York, Utah, Texas, and Nevada. APP-21-22. Though both guns found in the car were inside cases, those cases were unlocked, with loaded magazines alongside both guns.

## IV. A second magistrate judge denies Stephens's motion to reopen the detention hearing

In August 2022 Stephens moved to reopen the detention hearing under 18 U.S.C. § 3142(f). APP-75–178. The government opposed Stephens's motion. APP-50–74.

The district court referred Stephens's motion to a second magistrate judge for review. In denying Stephens's motion, U.S. Magistrate Judge Brian A. Tsuchida carefully explained—point-by-point—why Stephens had not presented new and material evidence that would warrant reopening of the detention hearing. APP-45–49. The magistrate judge concluded that Stephens's motion was "largely based on information that [Stephens] knew about at the time of the detention hearing, and arguments that he already raised." APP-49.

13

## V.    Stephens moves the district court to overturn the magistrate judges' orders

Stephens moved the district court to review both magistrate judges' detention orders under 18 U.S.C. § 3145(b). APP-32–44. Repeating arguments that both magistrate judges had considered and rejected, Stephens sought to downplay the seriousness of his crimes and to explain away his statements endorsing antisemitic and antigovernment violence. He also argued that the discovery of two unsecured guns in his car after the detention hearing was a factor that somehow *favored* reopening the hearing and releasing him. The government opposed Stephens's motion. APP-16–31.

## VI.    The district court's October 2022 order now on appeal

Reviewing de novo (APP-3), U.S. District Judge John C. Coughenour considered the first magistrate judge's detention order, as well as the second magistrate judge's order denying Stephens's motion to reopen the detention hearing. The district court upheld both those orders and rejected Stephens's arguments as meritless. APP-2–6.

The district court first described the case's procedural history and the relevant legal standards. APP-2–3. The court then turned to Stephens's motion for review of the original detention order.

14

The court noted that Stephens's case carries a presumption of detention under 18 U.S.C. § 3142(e). And the court found that Stephens had not overcome the presumption. APP-3–4. The court noted that Stephens presented "limited evidence regarding his risk of nonappearance"—an "executed surety agreement" and "a job offer." APP-3–4. But the court found that Stephens's proffered evidence did not fully address his risk of nonappearance, as those pieces of evidence "do not represent an individual cost and deterrent to Defendant's non-appearance." APP-4.

"Moreover," the court found, Stephens "is a technically savvy actor with connections to foreign drug suppliers, and he has been recorded stating his desire to flee the country." APP-4 (citing CR-57-7 at 4). The court found that Stephens "does not provide evidence to rebut those concerns." APP-4.

The court also found that, "[p]erhaps most importantly," Stephens "does not address at all the danger" that the first magistrate judge found he "poses to the community." APP-4 (citing CR-21 [APP-184–86]). The district court described Stephens's failure to address the magistrate judge's dangerousness findings as "conspicuous, given (a) the rebuttable

presumption presented by Count 1 of the Indictment; (b) the multiple firearms and thousands of rounds of ammunition recovered from Defendant's car and house; and (c) the violent statements Defendant was recorded saying to the undercover agent." APP-4 (citations omitted).

The district court also rejected Stephens's argument that he was not dangerous because his counsel had informed law enforcement where to find his car, which contained two of his guns. As the court explained, "the fact that one ceases a violent course when faced with law enforcement does little to demonstrate a lack of danger to the community were law enforcement absent." APP-4.

The district court concluded that "no condition or combination of conditions will reasonably assure [Stephens's] appearance and the safety of the community" (APP-4), and thus denied his motion to revoke the detention order.

The district court next denied Stephens's motion to reopen the detention hearing. APP-5–6. The court agreed with Magistrate Judge Tsuchida's detailed findings and concluded that the information cited by Stephens in support of reopening was generally known to Stephens at the

time of his detention hearing or is immaterial to the bail analysis. *Id.* The district court found that Stephens's job offer "is the only remotely new piece of evidence" but found that the job offer "does not justify reopening a detention hearing on its own given that Stephens's employment history and ability to find meaningful employment was considered at the initial hearing." APP-5. Concluding that Stephens "attempts to rehash old arguments without providing new material facts for consideration in establishing conditions of release," the district court found that "there is no basis to reopen the detention hearing." APP-5–6.

## ARGUMENT

### I. The district court correctly ordered Stephens detained pending trial

#### A. *Standard of review*

This Court reviews de novo a decision to order a defendant detained pretrial, with "deference to the district court's factual findings, absent a showing that they are clearly erroneous." *United States v. Motamedi*, 767 F.2d 1403, 1405–06 (9th Cir. 1985); *see United States v. Fidler*, 419 F.3d 1026, 1029 (9th Cir. 2005) (reviewing for clear error the "[f]actual findings underlying a district court's pretrial release or detention order, including whether a defendant is a flight risk or a danger to the public").

Under the clear-error standard, if "'the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it.'" *United States v. Mercado-Moreno*, 869 F.3d 942, 959 (9th Cir. 2017) (citation omitted). This principle holds true even if this Court would have weighed the evidence differently. *United States v. Reyes*, 772 F.3d 1152, 1157 (9th Cir. 2014).

## B.   *Applicable law*

The Bail Reform Act allows pretrial detention of a defendant without bail if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is appropriate if a defendant is a danger to the community or a flight risk; he need not be both. *Motamedi*, 767 F.2d at 1406.

A presumption of detention applies to the drug-trafficking offense charged in the superseding indictment.[11] There is thus a rebuttable presumption "that no condition or combination of conditions will

---

[11] The charged offense of conspiracy to distribute MDMA and ketamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846, carries a maximum prison sentence of twenty years. *See* 21 U.S.C. § 841 (b)(1)(C); 18 U.S.C. §§ 3142(e)(3)(A), (f)(1)(C).

18

reasonably assure the appearance of [Stephens] as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(A). "Although the presumption shifts a burden of production to the defendant, the burden of persuasion remains with the government." *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). Here, the district court and the magistrate judge found that Stephens failed to rebut the presumption of detention. APP-2–4, 185.

If a defendant successfully rebuts the presumption, four factors guide the analysis of "whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community: (1) the nature and circumstance of the charged offense, including whether it involves a firearm; (2) the weight of the evidence; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger his release would pose. 18 U.S.C. § 3142(g); *Motamedi*, 767 F.2d at 1407. The government need only prove flight risk by a preponderance of the evidence; proving dangerousness requires clear and convincing evidence. 18 U.S.C. § 3142(f); *Motamedi*, 767 F.2d at 1407.

19

If after a hearing the judicial officer determines "that no condition or combination of conditions will reasonably assure" both the defendant's appearance and "the safety of any other person and the community," pretrial detention is required. 18 U.S.C. § 3142(e). Here, the district court and the first magistrate judge found that Stephens is both a flight risk and a danger and that no available release conditions would adequately mitigate those risks. APP-2–6, 184–85.

## C.   *In finding that Stephens is both a flight risk and a danger to the community, the district court did not clearly err*

As the district court and the first magistrate judge found, Stephens has never overcome the statutory presumption of detention that applies to him. To the contrary, the evidence of his dangerousness and his risk of flight is overwhelming.

Although Stephens has no prior criminal history, has earned an AA degree, and claims strong ties to the community, family support, and a job offer (Mem. 2, 8), none of these factors outweigh the presumption of detention. This is especially so because, other than the proffered new job offer, none of the equities that Stephens cites in favor of his release precluded him from engaging in a sustained course of drug-trafficking

20

over several years. Moreover, that Stephens possessed an arsenal of firearms, ammunition, and body armor—while engaged in his chosen vocation of drug-trafficking—only underscores the danger he poses. Stephens also laundered more than $1 million in drug-trafficking proceeds; he possessed multiple fake ID cards; he used an alias and fake birthdates; he has foreign contacts; he operated on the darknet and used encrypted communications to evade law enforcement detection; and he has made statements showing a desire to leave the United States. Stephens falls far short of overcoming the presumption of detention.

But even if Stephens could meet his burden of production and rebut that presumption, *see Hir*, 517 F.3d at 1086, the 18 U.S.C. § 3142(g) factors overwhelmingly support his detention. Even if successfully rebutted, "the presumption is not erased" but "'remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g).'" *Hir*, 517 F.3d at 1086 (citation omitted). The presumption is not simply an evidentiary tool; instead, "the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to

trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) (citation omitted).

The 18 U.S.C. § 3142(g) factors weigh just as heavily in favor of detention today as they did in September 2021, when the magistrate judge issued the original detention order. And Stephens identifies no clear error in the district court's or magistrate judge's findings about his dangerous or flight risk.

1.    *The nature and circumstances of Stephens's offenses favor detention*

Stephens's offenses are serious. He operated as a prolific darknet drug trafficker for years while managing to avoid law enforcement detection. He used fake IDs, fake birthdates, and a fake name. He had connections with overseas drug suppliers—a fact he concedes. Mem. 12. He laundered more than $1 million in drug money. And despite Stephens's claims (*e.g.*, APP-13), the drugs he trafficked were dangerous. Ketamine, for example, is defined by Congress as a "date rape drug." 21 U.S.C. § 841(g)(2)(A)(ii).

Plus, Stephens did not just traffic drugs or launder drug money. He did so while possessing an arsenal of guns, body armor, and thousands of

rounds of ammunition in multiple calibers. Drug-trafficking and guns is an inherently "dangerous combination" that creates "a grave possibility of violence and death." *Smith v. United States*, 508 U.S. 223, 240 (1993); *see United States v. Stephens*, 237 F.3d 1031, 1033 (9th Cir. 2001) ("Congress enacted the current version of 18 U.S.C. § 924(c)(1) in reaction to a shocking correlation between drugs and violence."). The "danger posed to the public by armed conspirators who traffic in illicit drugs is too plain to permit dispute." *United States v. Daychild*, 357 F.3d 1082, 1100 (9th Cir. 2004).

Ignoring that reality, Stephens tries to describe his arsenal of weapons as innocuous—merely an example of exercising "a fundamental constitutional right." APP-17. Nonsense. Investigators seized multiple guns at Stephens's residence in Concrete, Washington, along with thousands of rounds of ammunition, body armor, and dealer-sized amounts of drugs. Stephens used the residence as the base for his drug-trafficking activities. He had more guns and drug-trafficking evidence stashed in his car. Stephens's gun possession was an appropriate factor for the district court to consider when assessing the potential danger that

Stephens poses. And if Stephens is convicted, his gun possession will at the very least support an enhancement at sentencing. USSG § 2D1.1(b)(1). These weapons, along with the overall nature and circumstances of Stephens's offenses, heavily favor detention.

###### 2. *The weight of the evidence favors detention*

Although this Court treats the weight of the evidence as the least important statutory factor, the Court is still "require[d]" to consider it. *Hir*, 517 F.3d at 1090 (finding that "the weight of the evidence clearly and convincingly establishe[d]" a likelihood that defendant would pose a danger if released); 18 U.S.C. § 3142(g)(2).

The evidence of Stephens's guilt is overwhelming—and he does not claim otherwise. Apart from noting that this Court treats the weight of the evidence as the least important § 3142(g)(2) factor (Mem. 6), Stephens ignores the powerful evidence of his guilt on all eight counts. And, indeed, he disregards the commonsense conclusion that the overwhelming evidence of his guilt also "makes it more likely that he will flee." *United States v. Gebro*, 948 F.2d 1118, 1122 (9th Cir. 1991).

24

3.   *Stephens's history and characteristics favor detention*

In the proceedings below, Stephens noted his lack of criminal history and his Washington State ties. But against those facts, the district court and the magistrate judges considered factors such as Stephens's lack of employment history, his demonstrated technical savvy and ability to evade law enforcement detection for several years, and his repeated statements endorsing antisemitic and antigovernment violence. The district court found that Stephens is "a technically savvy actor with connections to foreign drug suppliers," who "has been recorded stating his desire to flee the country," and who poses both a risk of flight and a danger to the community. APP-5.

On appeal, as below, Stephens tries to explain away his recorded statements as "offensive jokes." Mem. 25; APP-39, 42. But the district court and the magistrate judge found that those statements supported detention—and Stephens identifies no clear error in those findings. Moreover, while Stephens suggests that the government somehow elicited his antigovernment and antisemitic statement, the record rebuts any such suggestion. Stephens's recorded statements to the undercover agent also resemble statements that Stephens made in documents seized

from his digital devices. In those documents, Stephens denies the existence of the Holocaust; expresses disdain for "leftists" and support for "McCarthyism"; and discusses his idea of cultivating a "New Europe" that would be a "white baby factory" and that would produce so many white children that, county by county, "we take it all back." APP-26–27.

Though Stephens has made much of his ties to Washington States and argues that he would never flee the jurisdiction, the district court found that Stephens's own statements suggest otherwise. APP-4. When discussing future drug-trafficking operations, Stephens told UC1:

> Estonia is the new global HQ, right? It's still gonna happen here, and it will still be funded, but it's just like—*I'm not gonna be here.* Like I'm . . . like I'm not going to have a family here . . . that's insane . . . . If I had the option to not, why would I do that sending your kids to a public school here? Can you imagine? That's so irresponsible. Like, uh, so *I would go to Estonia or somewhere like that.*

APP-28, 169–70 (emphasis added). Although Stephens argues for different inferences he thinks should be drawn from these and other statements, *see, e.g.*, Mem. 13, he again identifies no clear error in the district court's or magistrate judge's findings about his flight risk and dangerousness.

Ultimately, Stephens's lack of criminal history and his Washington State ties did not deter him from trafficking drugs on the darknet for years, or from amassing a stockpile of guns and body armor, or from laundering more than $1 million in drug money, or from endorsing violence against Jews and the government.

### 4. *Release would pose serious dangers*

Given Stephens's yearslong pattern of trafficking dangerous drugs, his use of the darknet and encrypted message systems, his use of false identities, his demonstrated access to guns and body armor, and his repeated expressions of support for antisemitic and antigovernment violence, Stephens pretrial release would pose significant dangers. In so finding, the district court did not clearly err.

### D. *No release conditions can adequately protect the community and guarantee Stephens's appearance*

On appeal, as below, Stephens offers no valid reason to overturn the well-supported findings of the district judge and the magistrate judge that no conditions of release would adequately protect the community from Stephens or guarantee his appearance.

Indeed, all of Stephens's proposed release conditions suffer from the same "critical flaw": they depend on his "good faith compliance." *Hir*, 517

F.3d at 1092. But again, Stephens employed sophisticated means to evade law enforcement for years. And he has repeatedly expressed violent antigovernment views. He cannot be trusted to comply with any bond conditions that a court could impose.

### E. Stephens's general challenge to the adequacy of the district court's order is without merit

Stephens claims that the "district court seemingly ignored [his] lack of criminal history and significant ties to this district." Mem. 10. Not so. Stephens repeatedly highlighted those facts below. *E.g.*, APP-8, 13, 15, 35, 38, 47–48, 61, 76, 85, 94, 111. And the district court made clear that it had "reviewed the pleadings and the relevant record." APP-2. But the district court found—just like the magistrate judge had found before— that Stephens is both a flight risk and a danger, and that Stephens's proffered evidence did not rebut those concerns. APP-4. There is nothing "terse and conclusory" about the district court's order or the magistrate judges' orders. Mem. 6 (quoting *United States v. Nwokoro*, 651 F.3d 108, 111–12 (D.C. Cir. 2011)).

Only the magistrate judge was required to hold an evidentiary hearing. 18 U.S.C. §§ 3142(e)-(f). And only the magistrate judge was required to issue a detention order with "written findings of fact and a

written statement of the reasons for the detention." 18 U.S.C. § 3142(i).

In deciding whether to revoke that detention order under section 3145(b),

the district court was free to adopt the magistrate judges' findings as its

own. *See United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990).

The court's order more than satisfied the relevant requirements.

## II. The district court did not abuse its discretion by declining to reopen the detention hearing

### A. *Standard of review*

The United States is unaware of any published decision in which

this Court has set out a standard for reviewing a district court's order

declining to reopen a detention hearing under 18 U.S.C. § 3142(f). But

this Court characterized a district court's authority to reopen a detention

hearing as discretionary in *United States v. Strong*, 489 F.3d 1055, 1060

(9th Cir. 2007) (noting a "district court's ability to exercise its discretion

to reopen the detention hearing"). And motions panels have similarly

applied abuse-of-discretion review to the denial of a motion to reopen.

*E.g.*, *United States* v. *Willoughby*, No. 20-30238, Dkt. 8 (9th Cir. Dec. 11,

2020) (citing *Strong*). Other appellate courts have held that denials of

reopening under section 3142(f)(2) are reviewed for abuse of discretion.[12]

A district court abuses its discretion if it fails to apply the correct legal standard or if its application of the correct standard is "illogical, implausible, or without support in inferences that may be drawn from facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc).

In his motion, Stephens fails to acknowledge the proper standard of review for reopening and argues instead for de novo review. Mem. 4, 5. He cites no authority supporting de novo review of a district court's denial of a motion to reopen a detention hearing. And at no point in his brief does he claim the district court abused its discretion here. Stephens thus forfeits that argument. *United States v. Perez-Silvan*, 861 F.3d 935, 938 (9th Cir. 2017).

In any event, the record shows that the district court acted well within its discretion by denying Stephens's motion to reopen the detention hearing, because Stephens did not satisfy either of the

---

[12] *E.g.*, *United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *1 (6th Cir. May 21, 2020); *United States v. Stanford*, 367 F. App'x 507, 509 (5th Cir. 2010); *United States* v. *Hare*, 873 F.2d 796, 798 (5th Cir. 1989); *United States* v. *Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988); *United States* v. *Gotti*, 794 F.2d 773, 780 (2d Cir. 1986).

statutory requirements for reopening.

## B. *Applicable law*

A district court may reopen a detention hearing at any time before trial if the judicial officer finds that information exists that (1) "was not known to the movant at the time of the hearing" and that (2) "has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f).

"Courts interpret this provision strictly." *United States v. Knight*, 452 F. Supp. 3d 938, 945 (D. Nev. 2020); *see United States v. Ward*, 63 F. Supp. 2d 1203, 1206 (C.D. Cal. 1999). Thus, absent new information unknown at the time of the original hearing that materially bears on flight or dangerousness, a motion to reopen is properly denied.

## C. *The district court acted well within its discretion*

The district court did not abuse its discretion under 18 U.S.C. § 3142(f) by declining to reopen the detention hearing. The district court, like the magistrate judge, cited and applied the proper legal standards, including the new-information and materiality requirements in § 3142(f). APP-5-6, 45–49. And nothing about the court's decision was "illogical,

implausible, or without support in inferences that may be drawn from facts in the record." *Hinkson*, 585 F.3d at 1251.

To the contrary, the record amply supports both the district court's finding and the magistrate judge's finding that Stephens failed to meet the twin requirements for reopening. Again, Stephens cites no authority and no evidence that would support a different conclusion.

Stephens relies, for example, on an unpublished order from the District of Arizona in which the government moved to reopen a detention hearing over a defense objection. *United States v. Tommie*, No. CR10-1578-PHX-SRB, 2011 WL 2457521 (D. Ariz. June 20, 2011); *see* Mem. 21, 26–27 (citing *Tommie*). Stephens also relied on *Tommie* below. *E.g.*, APP-8, 29, 40, 43. But that case does not help him. In *Tommie*, the defendant was arrested in Florida on federal charges brought in the District of Arizona. Tommie was release on bond and served a summons to appear on a specific date in the District of Arizona. When Tommie ultimately made his initial appearance in Arizona—after missing his initial hearing date—the government learned that the pretrial investigation report upon which the Florida prosecutor relied when agreeing to bond had not listed five active warrants that Tommie had in the State of Arizona. While

Tommie was in state custody on the outstanding warrants, the government moved to reopen Tommie's detention hearing.

In granting the government's motion to reopen the detention hearing, the district court found that—unlike here—"information exists now that was not known to the Florida federal prosecutor and Pretrial Services officer at the time of the detention hearing in Florida . . . that *has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of Defendant as required and the safety of any other person and the community*." *Tommie*, 2011 WL 2457521, at *3 (emphasis added).

Here, the district court and the magistrate judge made opposite findings. And, more importantly, Stephens clearly knew that he had left two firearms in his unattended vehicle on a city street at the time of the initial detention hearing. That Stephens chose not to disclose their location prior to his detention hearing does not make it new for purposes of reopening. *Tommie* thus lends no support to Stephens's claim.

Similarly, Stephens's citation to the affidavit concerning the ownership of .45-caliber ammunition seized in the search of his home was neither new nor material information that would have justified

reopening. As with the location of the firearms, it stands to reason that Stephens would know whether this ammunition—seized from a cabinet  with glass doors in the living room of his residence—belonged to him or someone else. Moreover, though the government seized two shotguns and a rifle at the residence, it did not seize any pistol. Thus, even without the four boxes of .45-caliber ammunition, the government's argument that Stephens possessed additional firearms was fully supported by the government's seizure of thousands of rounds of 9mm ammunition from Stephens' residence. Given the quantity of firearms, ammunition, and body armor seized at the Concrete residence, the ultimate ownership of 200 rounds of .45 caliber ammunition was— and remains—immaterial to reopening.

Moreover, while an exact amount of equity that Stephens's mother had in her home was not discussed at the initial bond hearing, Stephens's counsel noted that:

> [T]he family's also agreeing or willing to enter a forfeiture agreement. Now, his brother owns a home in Illinois that is an investment property that has about $60,000 or so of equity in it. He has already executed a forfeiture agreement, a surety agreement,

> that he'd be willing to complete and file with the Court. His mother
> has also expressed a willingness to do the same. I believe her home
> has a bit more equity in it, since she's owned it for a long time and
> it's in Seattle where prices are a bit out of control.

APP-125. The magistrate judge presiding over the detention hearing explicitly considered this argument and rejected it. APP-130. And not just in a vacuum, but in the context of someone who had made statements about wanting to leave the United States, had foreign contacts, and had laundered a $1 million dollars of drug proceeds. While Stephens may have provided information about the exact amount of equity in his mother's home when seeking reopening before the magistrate judge and district court, there was nothing new or material about this information. Not surprisingly, neither the reviewing magistrate judge nor the district judge found this to be a basis for reopening. APP-5, 46.

Finally, Stephens' assertion that the transcripts of the various undercover hearings are new evidence is without merit. The government does not agree with Stephens's *argument* that the transcripts establish that he was in fact joking when he made repeated statements that— taken on their face—suggest a propensity or desire to engage in violent acts. Mem. 19. These are versions of the same arguments made by Stephens's counsel at the initial detention hearing before the first

magistrate judge in September 2021—arguments that the second magistrate judge and the district judge also considered and rejected. APP-5–6, 46–48.

In sum, Stephens presented information that was neither new *nor* material to the bail analysis. The magistrate judge and the district judge both had ample basis to find that Stephens failed to satisfy the requirements of 18 U.S.C. § 3142(f). The district court thus acted well within its discretion by declining to reopen the detention hearing.

## CONCLUSION

For all these reasons, the Court should deny Stephens's FRAP 9(a) motion and order that he remain detained pending trial.

Dated this 2nd day of December 2022.

> Respectfully submitted,
>
> NICHOLAS W. BROWN
> United States Attorney
>
> *s/ Joseph C. Silvio*
> JOSEPH C. SILVIO
> Assistant United States Attorney
> Western District of Washington
> 700 Stewart Street, Suite 5220
> Seattle, Washington 98101
> (206) 553-7970

## STATEMENT OF RELATED CASES

Counsel for the United States is not aware of any related cases that should be considered with this matter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 22-30171

I am the attorney or self-represented party.

**This brief contains** 7,677 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

⦿ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Joseph C. Silvio **Date** 12/02/2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*